## UNITED STATES v. GRAND RAPIDS & I. RY.

### (District Court, E. D. Michigan. October 5, 1916.)

#### (Syllabus by the Court.)

1. RAILROADS ⚖229—OPERATION—SAFETY APPLIANCE ACT.

   The main purpose of section 1 of Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (Comp. St. 1916, § 8605), was to save the lives and limbs of those men who theretofore had been required to go on the tops of moving trains to set the hand brakes.

2. RAILROADS ⚖229—OPERATION—SAFETY APPLIANCE ACT.

   The law requires that the speed of trains shall be controlled by the use of the power or air brake, and prohibits the use of hand brakes for that purpose.

3. RAILROADS ⚖229—SAFETY APPLIANCE ACT—SCOPE OF ACT.

   In a suit against a carrier based on the allegation that in certain specific instances the speed of its trains was controlled by the use of the hand brakes, and not by the use of the power brakes, evidence tending to show that, by reason of the steep grade over which the movements complained of were made, the former method of control is safer than the latter, held immaterial; the question of safety having been considered and determined by Congress when the law prescribing the method of control was enacted.

At Law. Action by the United States against the Grand Rapids & Indiana Railway. Judgment for plaintiff.

The following stipulation of facts was agreed to:

(1) That the defendant is, and was during all the times mentioned in said causes of action, a common carrier engaged in interstate commerce by railroad in the state of Michigan.

(2) That the line of defendant's railway in the state of Michigan, including the part of the line from Elmira, in the state of Michigan, to Boyne Falls, in

said state, was during said times part of a through highway of interstate commerce.

(3) That the defendant operated over its line of railroad and over the part of the line from Elmira to Boyne Falls and within the jurisdiction of this court its certain freight trains alleged in the said causes of action, to wit: November 29, 1915, train second 65, drawn by engine 85; November 30, 1915, train 65, drawn by engine 87; December 2, 1915, train extra north, drawn by engines 28 and 81; December 3, 1915, train 65, drawn by engine 85; December 4, 1915, train 65, drawn by engine 81.

- (4) That each of said trains was then and there engaged in the movement of interstate commerce.

(5) That the railway of the defendant continues and runs northward from Cadillac, Mich., to Mackinaw City, Mich., on the Straits of Mackinac, a distance of 128 miles. Intermediate stations are Elmira, 68 miles north of Cadillac, and Boyne Falls, 9 miles north of Elmira. The former crossing of the Boyne City, Gaylord & Alpena Railroad was 1 mile north of Boyne Falls at milepost 409, plus 3,300 feet.

(6) That there is a steep grade known as Boyne Hill descending to the north from a point at milepost 401 (4,900 feet north of the station at Elmira) to Boyne Falls (milepost 409), and thence on to the point of said former crossing (milepost 409, plus 3,300 feet), a distance of approximately 8¾ miles. The elevation at a point 400 feet north of Elmira station is 1,231 feet. At milepost 401 the elevation is 1,221 feet. At milepost 409, Boyne Falls, the elevation is 703.69 feet. At milepost 409, plus 3,300 feet, the elevation is 666 feet. The descent from milepost 401 to milepost 409, plus 3,300 feet, is 555 feet. For the 5 miles next north from milepost 401 the down grade is 73.9 feet in every mile. From the northerly end of said 5 miles the railway track descends 3¾ miles to milepost 409, plus 3,300 feet, upon a continuous grade, which is for nearly all that distance more than 1 per cent.; that is, 1 foot in every 100 feet, being a considerable part of that distance 1.2 and 1.3 per cent. in every 100 feet. The elevation at Petoskey, 15 miles north of said railroad crossing, is 650 feet.

(7) That each of the said trains mentioned in the first, second, fourth, fifth, and sixth counts in the declaration were run north from Cadillac to Mackinaw City. There were 40 cars in train second 65, November 29, 1915; 52 cars in train 65, November 30, 1915; 74 cars in extra train, December 2, 1915; 65 cars in train 65, December 3, 1915; and 53 cars in train 65, December 4, 1915. Each of said trains made a stop at Boyne Falls Station.

(8) That each of the locomotive engines drawing the trains mentioned in said first, second, fourth, fifth, and sixth counts in the declaration was at the time fully equipped with a power-driving wheel brake and appliances for operating the train brake system upon said trains and upon the cars therein, and that not less than 85 per cent. of the cars in each of said trains were at the time equipped with power and train brakes as required by section 1 in Act March 2, 1893, and in sections 1 and 2 in Act March 2, 1903, c. 976, 32 Stat. 943 (Comp. St. 1916, §§ 8613, 8614), and the order of the Interstate Commerce Commission June 6, 1910, and that all the said equipment and appliances and the train brake system were at the time in good order and repair and efficient condition and properly connected for use.

(9) That all the cars in said trains were at the time equipped with efficient hand brakes as required by section 2 in Act April 14, 1910, c. 160, 36 Stat. 298 (Comp. St. 1916, § 8618), in good condition and working order.

(10) That the handling of said trains was in accordance with the following general order issued by the defendant from the superintendent's office, in effect on the dates aforesaid:

"All concerned:

"All freight trains of 10 or more cars descending Boyne Hill, between KS tower and FA siding, must be controlled by hand brakes, and air brakes are not to be used unless it is evident that the trains can not be controlled by hand brakes or unless necessary to use air brake to make stop.

"All freight trains must come to a dead stop just before commencing to descend Boyne Hill, and set a sufficient number of hand brakes to properly con-

trol the train, and must also test their air brakes at the same time and know they are in proper working order.

"In addition to the hand brakes two or three retainers must be used all the way down the grade to avoid possible damage to cars in rear of train in case air brake is applied and released.

"When possible to avoid it, the same retainers or the same hand brakes should not be used all the way down the hill, account dangerous heating of wheels. When necessary to change retainers or hand brakes, fresh retainers or hand brakes should be set before the old ones are released.

"When a freight train descending Boyne Hill is being controlled by hand brakes, the engineman must give a warning of two short and one long whistles before applying the air brakes to give warning to train crew that air brake is about to be applied.          J. W. Hunter, Superintendent."

In addition to the foregoing stipulation of facts, certain oral testimony was offered by the defendant tending to prove that it was safer to control the speed of these trains by the use of hand brakes rather than by power brakes, and opposing testimony on this issue was offered in rebuttal by plaintiff.

John E. Kinnane, U. S. Atty., of Detroit, Mich., and Roscoe F. Walter, Special Asst. U. S. Atty., of Washington, D. C., for plaintiff.
James H. Campbell, of Grand Rapids, Mich., for defendant.

## On Motion to Direct Verdict.

TUTTLE, District Judge (after stating the facts as above). Neither the court nor the jury makes the law. This law, like the other laws that we have to do with in this court, is made by the Congress. It is the duty of the court to state to the jury what these laws passed by the Congress mean, and, having done that, it is the duty of the jurors to find out what the facts are, when facts material to the issue are in dispute. .Now, in this case the attorneys have been good enough to save us a great deal of trouble by stipulating what the facts are, except in regard to one matter. The government contends that this one element of the facts in dispute is not material to this case. The only element about which there is any dispute at all is whether or not it is safer in operating defendant's heavy freight trains over the grade in question to use the hand brakes in connection with the air brakes. The railroad very frankly and fairly admits what rule it had in force and what it required its men to do, and the conductor, engineer, and brakeman for the railroad have very frankly told us how they did operate the trains under that rule, which agrees substantially with what the government inspectors who were there and rode upon the trains say they did, so that there is no dispute about what the railroad did and how it had its trains equipped. The only thing that there is any dispute about at all is a conclusion of fact as to whether or not it is safer to operate a train as the defendant railroad company required it to be operated and did operate it, or to operate it by the air brakes alone. Now, I charge you that this conclusion of fact is not a material element in this case, and does not make any difference. That is a question which the Congress determined when it passed the law. Congress made the law, and, right or wrong, determined that very matter; and it saves you the necessity of deciding that issue of fact. The very first paragraph of the law in question is:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That from and after the first day

of January, eighteen hundred and ninety-eight, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving wheel brake and appliances for operating the train brake system, or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed, without requiring brakemen to use the common hand brake for that purpose."

[1, 2] Now, the purpose of that law, the purpose of that section, at least the main purpose of it, was to save the life and limb of those men who theretofore had been required to go out on top of those trains while they were in motion and turn the brakes. The purpose was to require not only that the train should be equipped with power brakes, but also that the power brakes should be operated. It would be a useless law that required such equipment, but still permit a rule or regulation by the carrier that prohibited the use of such equipment and required the use of the old hand brakes. The purpose of Congress was to fix it so that the engineer from his cab could check his train by the use of the air, hold it, and stop it, without requiring these brakemen to run along on the tops of the trains and turn the brakes. It is the duty of the courts to interpret that law in the light of the purpose for which it was enacted, and, if possible, to give to it the meaning which the Congress had in mind when enacting the law. It seems plain to me that that was the purpose and that is the meaning. Now, if that was the purpose, then the legislative branch of the government has determined what is required of the railroads, and it is not necessary every time a lawsuit is tried under that act for the court and the jury to find out whether it is better to use hand brakes or power brakes. I permitted proof in regard to that issue in this case because I did not know what the facts were, and you did not know what the facts were, when we started out with the lawsuit. I wanted the record to show clearly whether or not this was a case where an attempt had been made by the train crew to use the air brakes and they had failed to work, and that then the brakemen had gone out on the train and set the brakes. That would raise a different question and one that it is not necessary to pass upon in this case.

[3] The grade in question has existed for many years and is a part of the roadbed over which every train that passes over that route has to go. In the so-called Great Northern Railway Co. Case, 229 Fed. 927, 144 C. C. A. 209, it was held as follows:

"Aside from the language of the act and the amendments, there is external evidence that it was the intention of Congress thereby to make it unlawful to require brakemen to use hand brakes in the ordinary management and movement of freight trains in interstate commerce."

It was partially in view of the foregoing language used by the Circuit Court of Appeals of the Ninth Circuit that I permitted the testimony to be taken and the record in this case to be made, so that we might know whether the things complained about by the government had been done in the ordinary operation of the railroad.

I say to you as a matter of law that the things complained of by the government, as shown by this record, were in the ordinary opera-

tion of the railroad. In other words, it was not any unusual or special situation existing at that time. This was the usual grade, the usual train, and operated in the usual way according to the rules promulgated by the railroad company. The thing done was not made necessary by some emergency, but it was the usual ordinary operation of the train in accordance with the rule that the government is complaining about. It is admitted that the trainmen in every instance, while descending this grade and while the trains were in motion, were required to go on top of the cars and turn the hand brakes, and that this was contemplated by the rule.

Now, giving the defendant the most favorable view of all the testimony—in other words, assuming that you were to find by your verdict that it was safer to use the hand brakes in connection with the air brakes—I would still be compelled to charge you that, even though that was true, the defendant must operate their trains according to the law. The law requires that the speed of trains engaged in interstate commerce, or hauled over a highway of interstate commerce, shall be controlled by the use of power brakes on said train operated by the engineers on the locomotives drawing such trains. The law prohibits the control of the speed of trains engaged in interstate commerce, or hauled over a highway of interstate commerce, by the use of hand brakes on the cars in such train. After a careful study of the act, I believe that is the interpretation that should be given to it, and it is particularly my duty to so interpret the law, in view of the decision of the Fourth Circuit Court of Appeals in the case of the Virginian Railway Co., Plaintiff in Error, v. United States of America, decided May 4, 1915, 223 Fed. 748, 139 C. C. A. 278, and the decision in the Ninth Circuit in the case of the United States of America, Plaintiff in Error, v. Great Northern Railway Co., Defendant in Error, decided February 14, 1916, 229 Fed. 927, 144 C. C. A. 209.

So, I charge you, gentlemen of the jury, and direct you to return a verdict in favor of the plaintiff, the United States of America, and against the defendant, the Grand Rapids & Indiana Railway Company finding the defendant guilty as charged in all five of the counts of the declaration now here on trial, namely, counts 1, 2, 4, 5, and 6, and the clerk will take your verdict accordingly.